UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| AARON RANSOM, <br><br> PLAINTIFF <br><br> v. <br><br> ASPEN MEDICAL PRODUCTS, LLC. <br><br> DEFENDANT. | CASE NO. 2:23-cv-407 <br><br> JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

Plaintiff Aaron Ransom submits this Amended Complaint seeking to recover damages against Defendant, Aspen Medical Products, LLC ("Aspen" or "Defendant") under Title VII of the Civil Rights Act, 42 U.S.C. 2000e et seq. ("Title VII") and the Virginia Human Rights Act, Va. Code § 2.2-3905 et seq. (the "VHRA") based on Aspen's failure to accommodate Ransom's sincerely held religious beliefs, as well as Aspen's discriminatory and retaliatory treatment of Ransom based on his religious beliefs.

## PRELIMINARY STATEMENT

1. This case concerns a transparent scheme by Defendant to discipline and remove employees who sought lawful exemptions to the company's COVID-19 vaccine policy.

2. Plaintiff Aaron Ransom was a highly successful sales representative for Aspen beginning in or around December 2020.

3. Aaron Ransom was hired by Defendant in the midst of the COVID-19 pandemic, and despite the fact that many Aspen customers had closed their facilities to sales representatives

at that time, Ransom continued to hit high sales numbers by staying in touch with customers and marketing to them remotely.

4. In early December 2021, after the COVID-19 vaccine had been available to the public for nearly a year, Aspen abruptly implemented a mandatory COVID-19 vaccine policy.

5. Notably, Aspen did not adopt any formal procedures to allow employees to request federally mandated exemptions to its vaccine policy; instead, **Aspen threatened unvaccinated employees, in writing, by instructing them that they would be required to hit higher sales figures than their vaccinated colleagues if they requested a medical or religious accommodation**.

6. Notwithstanding Aspen's threat, Ransom submitted a formal religious accommodation request to Aspen in which he respectfully and thoughtfully explained why his religious beliefs conflicted with the COVID-19. Vaccine.

7. Notably, throughout his tenure at Aspen, Ransom's vaccination status **never impacted his ability to access customer facilities and make sales to Aspen customers in his territory**.

8. Nevertheless, in January 2022, and without having consulted Ransom further about his religious accommodation request, Aspen notified Ransom, in writing, that it was denying his accommodation request and terminating his employment.

9. Incredibly, Aspen based its termination decision on the objectively false pretense that Ransom would not be able to access customer facilities while unvaccinated.

10. Moreover, upon information and belief, Aspen issued a blanket denial to any employee who submitted a vaccine accommodation request, irrespective of whether that employee could be reasonable accommodated.

11. Accordingly, and based on the facts set forth in more detail below, Ransom respectfully seeks relief from this Court for Aspen's brazen and unapologetic violation of his religious rights under Title VII and the VHRA.

**PARTIES**

12. Ransom is an individual domiciled in Chesapeake, Virginia.

13. Aspen is a limited liability company organized under California law with a principal place of business in Irvine, California.

**JURISDICTION & VENUE**

14. This Court has subject matter jurisdiction over Ransom's federal statutory claims pursuant to 28 U.S.C. § 1331.

15. This Court has supplemental jurisdiction over Ransom's state law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Ransom's federal claims, the claims derive from a common nucleus of operative fact as Ransom's federal claims, and the exercise of supplemental jurisdiction would be in the interest of judicial economy, convenience, fairness, and comity.

16. Moreover, this Court has subject matter jurisdiction over all of Ransom's claims pursuant to 28 U.S.C. § 1332 because Ransom and Aspen are citizens of different States and the matter in controversy exceeds the value of $75,000.00.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

17. On or about May 12, 2022, Ransom filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") asserting the claims alleged herein against Aspen.

18. Ransom's May 12, 2022 filing with the EEOC was deemed joint filed with the

Office of Civil Rights of the Office of the Virginia Attorney General ("OCR") pursuant to a work-sharing agreement between the EEOC and the OCR.

19. On or about August 4, 2023, the OCR issued a Notice of Right to Sue Letter to Ransom pursuant to Va. Code § 2.2-3907.

20. Moreover, on or about August 8, 2023, the EEOC issued a Notice of Right to Sue Letter to Ransom pursuant to 42 U.S.C. § 2000e-5.

21. Accordingly, Ransom has exhausted all administrative remedies necessary to bring the causes of action alleged herein.

**FACTUAL ALLEGATIONS**

**Aspen's Business Model and Product Specialists**

22. Aspen is a California-based company that develops, markets, and sells spinal immobilization medical products and devices to customers throughout the United States and internationally.

23. Aspen markets and sells products primarily through sales representatives known as Product Specialists, who are Aspen employees responsible for building and engaging with Aspen's customer base and responding to customer inquiries about Aspen products.

24. Among its Product Specialists, Aspen retains a series of outside sales representatives, known as Field Product Specialists.

25. Field Product Specialists are assigned geographic regions or "territories" and are responsible for marketing and selling products to the company's customer bases in those regions.

26. Aspen does not specifically regulate the means or manner by which Field Product Specialists must interact with customers in their territories; rather, Product Specialists are given broad latitude to engage with customers as they see fit, so long as they are consistently making

4

sales.

27. As such, Aspen Field Product Specialists interact with customers in a number of ways, including emails, phone calls, in-person visits, and video conferencing.

**Product Specialists' Pay and Quota System**

28. Aspen Product Specialists are paid an annual base salary, along with a monthly performance-based bonus.

29. To determine Product Specialists' bonuses, Aspen relies on a sales "quota," which it calculates based on the collective sales achieved by all Aspen Product Specialists in a given month.

30. Specifically, Product Specialists who meet or exceed 95 percent of a given monthly sales quota earn a bonus payment in addition to their base salary.

31. Moreover, the amount of a Product Specialist's bonus increases for every percentage point in sales they achieve beyond the 95 percent quota.

32. Product Specialists are not required to meet or exceed Aspen's sales "quota" as a condition of employment; rather, sales quotas serve merely as a threshold for determining whether Product Specialists are entitled to bonus payments.

33. Indeed, upon information and belief, no Product Specialist at Aspen had ever been terminated for failing to meet a sales quota prior to Ransom's termination.

**Ransom's Role as a Field Product Specialist**

34. Aspen hired Ransom as a Field Product Specialist beginning in or around December 2020.

35. Ransom was assigned the state of Virginia as his sales territory, where he both lived and worked at all times relevant to this dispute.

36. Throughout his tenure at Aspen, Ransom performed exceptionally. Indeed, Ransom regularly engaged with and made sales to existing Aspen customers throughout Virginia and also established relationships and made sales with new customers.

37. On many months, Ransom achieved sales that met or exceeded Aspen's monthly sales quotas.

38. Moreover, Ransom always achieved sales figures that were either consistent with or exceeded the sales figures achieved by other Aspen Product Specialists working in the same or similar territories.

39. Further, Ransom was never reprimanded or disciplined for performance problems during his tenure at Aspen.

40. To the contrary, Ransom received high marks from his supervisor during his December 2021 performance review—the only review that he received during his employment with Aspen.

**The COVID-19 Pandemic and Ransom's Sales**

41. In or around early 2020, the COVID-19 pandemic began to spread throughout the United States.

42. As a result, many of Aspen's customers started to close off their facilities to in-person visits from private vendors, including Aspen sales representatives.

43. Fortunately, these changes had little impact on Ransom's ability to interact with customers and make sales.

44. Indeed, while Ransom periodically needed to conduct in-person customer visits for product demonstrations, he was able to complete the overwhelming majority of his marketing and sales work through emails, phone calls, or other virtual means, such as video conferencing.

6

45. Moreover, Ransom found that, at least in his territory, many facilities, such as orthopedic practices or doctors' offices, continued to allow in-person vendor visits. As such, Ransom was still able to conduct many of his sales visits on-site throughout the pandemic.

**Aspen's Vaccination Policy and Ransom's Religious Accommodation Request**

46. In or around the fall of 2021, Aspen sent an email to Ransom and other Product Specialists asking whether they had received a COVID-19 vaccination.

47. Ransom was, and continues to be, a devout Christian with a sincere religious objection to the COVID-19 vaccination. As such, Ransom responded to Aspen's email stating that he had not been vaccinated against COVID-19.

48. Days later, Tony Morgan, Ransom's direct supervisor, approached Ransom and advised him that Aspen was considering a mandatory COVID-19 vaccination policy and that Ransom should consider requesting an exemption if he had a legal basis to do so.

49. Thereafter, on or about November 11, 2021, Ransom submitted a religious accommodation request (the "Accommodation Request") to Kathryn Gray, Aspen's Chief Administrative Officer.

50. In the Accommodation Request, Ransom explained his religious beliefs in detail and why his beliefs conflicted with any policy that Aspen may impose requiring employees to receive the COVID-19 vaccination. Ransom therefore respectfully asked that he be exempted from any future COVID-19 vaccination mandate.

51. Thereafter, on December 1, 2021—and without having responded to Ransom's Accommodation Request—Gray sent an email to its sales representatives stating that Apsen was requiring all Field Product Specialists to be fully vaccinated against COVID-19 by February 1, 2022 (the "Vaccine Mandate Email").

7

52. The Vaccine Mandate Email stated that Aspen had waited to impose a vaccine mandate so that it could "take the time to see what competitors actions regarding Covid-19 vaccinations might be, what customers will require of sales people, and weigh those facts against the desires of our team."

53. Notably, the Vaccine Mandate Email did not offer any specific procedures for requesting a vaccine exemption, nor did the email identify any special factors that would be considered in determining whether an exemption request would be granted. Instead, the email simply stated that exemption requests for "medical or religious reasons would be evaluated on an individual, case-by-case basis."

54. The Vaccine Mandate Email also stated: "should an exemption be granted, sales quotas must be met at 100% each month to remain an active Aspen MP sales professional."

55. Accordingly, the Vaccine Mandate Email expressly purported to hold exempted Product Specialists to a higher sales standard than Product Specialists who were not seeking medical or religious exemptions.

**Aspen Denies Ransom's Religious Accommodation Request and Terminates Ransom**

56. After receiving the Vaccine Mandate Email, Ransom continued to work diligently as he waited for Aspen to respond to his Accommodation Request.

57. During this time—and at all times during his employment with Aspen—Ransom's vaccination status had no impact on his ability to interact with customers and perform his job.

58. To be sure, Ransom found that all or nearly all of the customer facilities in his territory **either had no vaccination requirement or otherwise readily accepted vaccine exemption requests from vendors**.

59. In fact, **there was never one instance throughout Ransom's tenure with Aspen**

8

**where he was not able to enter a customer facility and engage with Aspen customers because of his vaccination status**.

60. As a result, Ransom continued to make sales at a rate that met or exceeded that of his vaccinated colleagues—as he always had.

61. Nevertheless, and contrary to the Vaccine Mandate Email, Aspen did not conduct an "individual" or "case-by-case" assessment of Ransom's circumstances to determine whether he could be exempted from the vaccine mandate.

62. In fact, Aspen never contacted Ransom at all to ask any questions about his religious beliefs or to assess whether his vaccination status was impacting his performance.

63. Instead, on January 14, 2022, Ransom received a letter from Kathryn Gray summarily denying his Accommodation Request and terminating his employment with Aspen (the "Termination Letter").

64. In explaining the decision, the Termination Letter stated vaguely that "it has become a strong business consideration to not grant any exemption that would keep our field sales personnel from being able to initiate and maintain contact with our customers."

65. The Termination Letter did not, however, offer any examples of how Ransom's proposed accommodation request would keep him from being able to "initiate and maintain contact" with customers or otherwise continue to do his job as he had been doing for the prior 12 months.

**Ransom Continues to Perform the same Duties as a Product Specialist after his Termination**

66. Following his termination from Aspen, Ransom began working as a medical sales professional in a freelance capacity—albeit for far less income.

67. In his freelance role, Ransom continued to visit the same facilities and make the

same types of sales as he had executed before he was terminated from Aspen.

68. Notably, Ransom remained unvaccinated during this time and never had any trouble gaining access to facilities or customers.

### COUNT I—FAILURE TO ACCOMMODATE RELIGIOUS BELIEFS UNDER TITLE VII

69. Ransom incorporates the preceding paragraphs by reference.

70. Aspen is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

71. At all relevant times Ransom was an "employee" of Aspen within the meaning of 42 U.S.C. § 2000e(f).

72. During his tenure at Aspen, Ransom held a bona fide religious belief that conflicted with Aspen's requirement that employees become fully vaccinated with the COVID-19 vaccination.

73. Ransom made Aspen aware of his religious belief and expressly requested to be accommodated.

74. Ransom's Accommodation Request was reasonable and would not have posed a burden on Aspen.

75. Notwithstanding Ransom's reasonable request, Aspen denied Ransom's Accommodation Request and terminated Ransom for failing to obtain the COVID-19 vaccination.

76. As a direct and proximate result of Aspen's actions, Ransom has incurred substantial damages.

### COUNT II—DISPARATE TREATMENT BECAUSE OF RELIGION UNDER TITLE VII

77. Ransom incorporates the preceding paragraphs by reference.

78. Aspen is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

79. At all relevant times Ransom was an "employee" of Aspen within the meaning of

42 U.S.C. § 2000e(f).

80. During his tenure at Aspen, Ransom had sincerely held religious beliefs and/or affiliations, which he communicated to Aspen or of which Aspen became aware.

81. Aspen thereafter took adverse action against Ransom and/or treated him differently from similarly situated employees because of his religious beliefs and/or affiliations in ways that include but are not necessarily limited to: holding him to higher performance standards than similarly situated employees and terminating his employment.

82. As a direct and proximate result of Aspen's actions, Ransom has incurred substantial damages.

### COUNT III—RETALIATION UNDER TITLE VII

83. Ransom incorporates the preceding paragraphs by reference.

84. Aspen is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

85. At all relevant times Ransom was an "employee" of Aspen within the meaning of 42 U.S.C. § 2000e(f).

86. During his tenure at Aspen, Ransom engaged in protected activity under Title VII in ways that include but are not necessarily limited to: requesting an accommodation for his sincerely held religious beliefs.

87. Aspen took materially adverse action against Ransom for engaging in protected activity under Title VII in ways that include but are not necessarily limited to: holding him to higher performance standards and terminating his employment.

88. As a direct and proximate result of Aspen's actions, Ransom has incurred substantial damages.

## COUNT IV—FAILURE TO ACCOMMODATE RELIGIOUS BELIEFS UNDER THE VHRA

89. Ransom incorporates the preceding paragraphs by reference.

90. Aspen is an "employer" within the meaning of Va. Code § 2.2-3905.

91. At all relevant times, Ransom was an employee of Aspen within the meaning of Va. Code § 2.2-3905.

92. During his tenure at Aspen, Ransom held a bona fide religious belief that conflicted with Aspen's requirement that employees become fully vaccinated with the COVID-19 vaccination.

93. Ransom made Aspen aware of his religious belief and expressly requested to be accommodated.

94. Ransom's Accommodation Request was reasonable and would not have posed a burden on Aspen.

95. Notwithstanding Ransom's reasonable request, Aspen denied Ransom's Accommodation Request and terminated Ransom for failing to obtain the COVID-19 vaccination.

96. As a direct and proximate result of Aspen's actions, Ransom has incurred substantial damages.

## COUNT V—DISPARATE TREATMENT BECAUSE OF RELIGION UNDER THE VHRA

97. Ransom incorporates the preceding paragraphs by reference.

98. Aspen is an "employer" within the meaning of Va. Code § 2.2-3905.

99. At all relevant times, Ransom was an employee of Aspen within the meaning of Va. Code § 2.2-3905.

100. During his tenure at Aspen, Ransom had sincerely held religious beliefs and/or

affiliations, which he communicated to Aspen or of which Aspen ultimately became aware.

101. Aspen thereafter took adverse action against Ransom and/or treated him differently from similarly situated employees because of his religious beliefs and/or affiliations in ways that include but are not necessarily limited to: holding him to higher performance standards than similarly situated employees and terminating his employment.

102. As a direct and proximate result of Aspen's actions, Ransom has incurred substantial damages.

## COUNT VI—RETALIATION UNDER THE VHRA

103. Ransom incorporates the preceding paragraphs by reference.

104. Aspen is an "employer" within the meaning of Va. Code § 2.2-3905.

105. At all relevant times Ransom was an "employee" of Aspen within the meaning of Va. Code § 2.2-3905.

106. During his tenure at Aspen, Ransom engaged in protected activity under the VHRA in ways that include but are not necessarily limited to: requesting an accommodation for his sincerely held religious beliefs.

107. Aspen took materially adverse action against Ransom for engaging in such protected activity under the VHRA in ways that include but are not necessarily limited to: holding him to higher performance standards and terminating his employment.

108. As a direct and proximate result of Aspen's actions, Ransom has incurred substantial damages.

## PRAYER FOR RELIEF

109. WHEREFORE, Ransom respectfully requests that the Court enter judgment in his favor granting him legal and equitable relief as the Court may deem just, including, but not limited

to:

    a. front and back pay;

    b. compensatory damages;

    c. punitive damages;

    d. reinstatement;

    e. interest;

    f. reasonable attorneys' fees and costs; and

    g. any other relief to which Ransom is entitled by law and to which the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff Aaron Ransom demands a trial by jury on all triable issues pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

/s/
Ben D. Johnson (VSB No. 90812)
Pierce McCoy PLLC
1111 E Main Street, Suite 1800
Richmond, Virginia 23219
Tel: 804-413-4021
Fax: (757) 257-0387
bjohnson@piercemccoy.com

*Counsel for Plaintiff Aaron Ransom*